Reversed.

26 C.C.P.A. (Patents)
### In re OSTERSTROM.
### Patent Appeals No. 4073.

Court of Customs and Patent Appeals.
March 6, 1939.

Edward F. Liebrecht, of New York City (G. H. Palmer, of Pleasantville, N. Y., Edward B. Beale, of Washington, D. C., and Pike H. Sullivan, of Chicago, Ill., of counsel), for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

There are here involved eight claims of an application for patent, filed in the United States Patent Office March 7, 1932, for a process for removing gum-forming and color-imparting bodies from cracked unsaturated hydrocarbon oils. The claims, numbered respectively, 1, 7, 8, 10, 11, 12, 13, and 15, were rejected by the examiner as non-patentable in view of prior art and the Board of Appeals affirmed the examiner's decision. Applicant thereupon took the instant appeal to this court. The reasons of appeal cover all the appealed claims and in addition there is a special assignment to the effect that the board erred in failing to pass specifically upon the merits of claim 15, and this claim is separately discussed in appellant's brief before us.

One claim, numbered 3, stands allowed.

For illustrative purposes we quote claims 1, 7, 10, 12 and 15:

"1. The method of removing gum-forming and color-imparting bodies from cracked low boiling petroleum oils containing high percentages of unsaturated hydrocarbons, which comprises subjecting such oils admixed with previously formed hydrocarbon polymers to temperatures of the order of 500° to 600°F. while said oils are maintained under pressures sufficiently high to prevent substantially the evolution of vapor to effect polymerization of undesired compounds, then passing all of said oils containing said polymers while still in the liquid phase and without fractionation into direct contact with a finely divided solid polymerizing agent to effect further polymerization of undesired compounds, subsequently fractionating the oils following contact with the agent and under reduced pressures to separate such oils into relatively low and high boiling fractions, the low boiling fractions comprising the desired treated oils and the high boiling fractions comprising polymers of the undesired compounds, and returning a portion at least of said polymers of the process for admixture with incoming charging oils to be treated for use as a polymerization promoting catalyst therein.

"7. In a process for effecting the removal of gum-forming and color-imparting bodies from cracked low boiling unsaturated hydrocarbon oils, the steps which comprise passing a solely petroleum mixture composed of such oils and previously formed hydrocarbon polymers containing said objectionable bodies through an elongated heating zone wherein said mixture is heated to a temperature above its normal vaporizing temperature but substantially below a cracking temperature while the mixture is maintained in the liquid phase by the employment of super-atmospheric pressures, removing the mixture from the heating zone and without fractionation or substantial reduction in pressure thereof passing the said mixture while still in the liquid phase and containing said polymers into contact with solid adsorptive polymerizing catalyst, and fractionating the oils under reduced pressures and following contact with said treating agent to separate the desired oils as vapors from the heavier polymerized compounds.

"10. In a process for effecting the removal of gum-forming and color-imparting bodies from cracked low boiling unsaturated hydrocarbon oils, the step which comprises passing an all-petroleum mixture composed of approximately 90% of said cracked oils and 10% of previously formed hydrocarbon polymers through a heating zone wherein said mixture is heated to a temperature above its normal vaporizing temperature but substantially below a cracking temperature thereof while the mixture is maintained in the liquid phase by the employment of super-atmospheric pressures, and without fractionation contacting said mixture upon discharge from the heating zone and containing said polymers with a finely divided solid adsorbent without substantial reduction in the pressure thereon.

"12. In a process for effecting the removal of gum-forming compounds from cracked low boiling unsaturated hydrocarbon oils, the steps which comprise continuously passing a mixture composed of such low boiling oils together with a minor portion of previously formed hydrocarbon polymers through a heating zone, heating said mixture during its passage through said zone to a temperature above its normal vaporizing temperature but not in excess of about 600°F. while the mixture is maintained in substantially the liquid phase by the employment thereon of superatmospheric pressures, retaining said mixture in said zone for a sufficient period of time to polymerize at least in part the objectionable gum-forming compounds present in said oils, removing the mixture from the heating zone and, without fractionation or substantial reduction in pressure thereon, bringing the same while still in the liquid phase and containing said polymers into contact with solid adsorptive polymerizing catalyst to complete the polymerization of the undesired gum-forming constituents present in said oils, and fractionating the oils under reduced pressures following contact with said treating agent and separating the desired oils as vapors from the heavier liquefied polymers.

"15. In a process for effecting the removal of gum-forming and color-imparting bodies from cracked low boiling unsaturated hydrocarbon oils, the step which consists in passing a solely petroleum liquid mixture of such oils and unmodified hydrocarbon polymers containing the aforesaid bodies through a heating zone wherein the mixture is heated in the liquid phase to a temperature of the order of 600°F. while maintained under superatmospheric

pressure sufficient to maintain such oils in the liquid phase at the temperature of treatment."

Claim 8 differs from claim 7 in reciting that polymer liquid obtained by fractionating the completely treated oil is returned for admixture with fresh incoming oil. Claim 11 differs from claim 10 in reciting fractionation of the treated oil from the second treating step to separate treated vapors from polymerized oil. Claim 13 like claim 12 recites the retention of the mixture in the first heating zone for a time described, and in addition includes the step of fractionating the treated material to separate polymers and returning the polymers for processing as in claims 1 and 8.

A general description of appellant's claimed invention is stated in the brief on his behalf as follows:

"* * * Appellant's invention consists of:

"A two-step heat treatment of low boiling hydrocarbon oils at temperatures above the normal vaporizing temperature of the oils but below the cracking temperature thereof, wherein,

"(1) The oil is maintained in the liquid phase in both steps by the application of superatmospheric pressure, and

"(2) The oil is treated in the first step in admixture with previously formed hydrocarbon polymers and without contact with any non-petroleum catalytic material to effect polymerization of at least a part of the objectionable gum-forming and color-imparting compounds present in the oil, and

"(3) The resulting mixture of partially treated oil and polymerized hydrocarbons is passed without fractionation or substantial reduction in pressure to a second treating step wherein,

"(4) The oil, including the polymers, is contacted with solid adsorbent catalytic material such as fullers' earth to effect further conversion by polymerization of the undesired gum-forming and color-imparting constituents to products higher boiling than the desired motor fuel product."

The references cited are: Gray, 1,-759,814, May 20, 1930; Osterstrom et al., 1,789,413, January 20, 1931; Cross, 1,-760,585, May 27, 1930; Stafford, 1,823,-175, September 15, 1931; Stevens et al., 2,044,739, June 16, 1936; Gurwitsch, "The Scientific Principles of Petroleum Technology," 1926, pages 79 and 82.

The examiner seems to have treated the patents to Stafford and Cross as primary references. In its decision the board said: "The examiner has rejected the claims on the patents to Cross or Stafford in view of Gray, Osterstrom et al., Stevens et al. or the publication to Gurwitsch. It is the examiner's position that the first two patents have the combination of first heating in the liquid phase in a coil and then passing all of the products to a clay treating step and that to recycle polymers would be obvious from the last four references cited."

As later will appear the board seemingly relied wholly on Stafford as the primary reference.

The primary contention on behalf of appellant, which applies to all of the appealed claims, is, in effect, that they relate to a two-step treating process and that neither Stafford nor Cross was concerned with other than a one-step treating process.

The two steps upon which appellant's arguments on the phase of the case now under discussion are based are expressed in claim 1, supra, by the clauses (a) "subjecting such oils * * * to temperatures * * *," and (b) "then passing all of said oils * * * into direct contact with a finely divided solid polymerizing agent * * *."

In appellant's brief it is asserted that: "The Patent Office has been unable to cite a single instance in the prior art of the use of a two-step process for the treatment of a hydrocarbon oil to remove gum-forming and color-imparting constituents, wherein the first step consists of the heat treatment of the oil in the liquid phase at elevated temperature in the absence of a non-petroleum catalyst to effect at least partial polymerization of undesired gum-forming and color-imparting constituents of the oil and wherein the resulting mixture of polymers and partially treated oil is passed, still in the liquid phase, to a second treating step in which the oil is contacted with a solid absorbent material to promote further polymerization of undesired color-imparting and gum-forming constituents."

As we understand his decision, it was the view of the examiner that both Cross and Stafford disclosed two stages of treatment. We are unable definitely to deter-

mine just what the view of the board was as to the teaching of Cross upon this or any other phase of the controversy. It made no analysis of the Cross patent, merely stating briefly the contention of appellant without expressing any opinion in regard to it. Its principal discussion was of the Stafford patent. The Gurwitsch publication was referred to as disclosing that "it is known in the art that products of polymerization already formed have themselves the property of promoting polymerization," and the patent to Gray as disclosing "that it is old to recycle the polymers drained out * * *." After this the board said: "In view of these well known features in the art, it is considered that the claims involve nothing patentable over the patent to Stafford. The other rejections may be considered cumulative."

Appellant presents with his application a drawing illustrating a device by means of which his process may be carried out. The Stafford patent also has a drawing, upon which, taken in connection with the patent specification, the board based the following statement:

"The patentee Stafford states * * * that the heating coil 1 may be heated by circulating hot products of combustion thereover and that treating cells 2 and 3 and the connections between the heater and the treating cells may to advantage be lagged or mildly heated externally to prevent loss of heat during the treating operation, that the pressure on the treating cells may be regulated and the rate of flow of oil through the treating cells controlled by the valves 7, 8 and 9 and the pump 6 so as to maintain any desired pressure on the oil during treatment and so that the period of time over which the oil is in contact with the absorbent material is sufficient to effect conversion of the unstable, unsaturated hydrocarbons to higher boiling polymers. The pump 6 is located in the pressure line ahead of the heating coil 1 and since as here described it is a part of the means to maintain the desired pressure on the oil during treatment and to control the period of time it is treated, it seems obvious that the period of time that the oil is in contact with the material in the treating cells 2 and 3 is in accordance with the period of time that the oil remains in the heating coil 1.

"It is further stated in the Stafford patent that the heavier solvent oil containing the dissolved higher boiling polymers may be drawn off as a liquid from the bottom of the tower 4, that the solvent oil and dissolved constituents may be charged directly while hot to a pressure still wherein both the solvent oil and higher boiling polymers may be subjected to further cracking treatment, that this method of operation is particularly advantageous when pressure still charging stock is employed as a liquid solvent in the treating operation.

"It seems that this description indicates definitely that the solvent oil, together with the dissolved higher boiling polymers may be used as the liquid solvent to be combined with the gasoline distillate which is treated in the heating coil 1."

Appellant filed a written request that the board reconsider its decision and "more particularly amplify" its holding with respect to claims 1, 12, and 13. This request seems to have been treated by the board as a petition for rehearing. At any rate, it is recited that "the petition is denied," but it did write an opinion in connection with such denial. From that opinion we quote the following:

"Petitioner's contention related particularly to the rejection on the Stafford patent, is that there is no suggestion in the patent disclosure which would teach one skilled in the art that partial polymerization should be carried out in heating coil 1, nor that such partial polymerization is inherently present in the Stafford process. The petition argues that in each of the claims 1, 12 and 13 and in his specification the oil undergoing treatment in the first stage is retained therein for a period of time sufficient to effect partial polymerization.

"Claim 1 does not appear to have this limitation to a period of time sufficient to effect partial polymerization stated therein. It is argued that Stafford does not do this. It is also argued that it is of importance that a longer period of time is required to effect polymerization by heat and pressure in the first stage than in the second stage. This difference in the periods of time for the two stages does not appear to be incorporated in the claims here under consideration. In any event, it is believed such limitations would not render these claims patentable over the Stafford patent. * * * * * *

"According to applicant's specification, as indicated, the polymerization material

exerts a catalytic action and accelerates the desired polymerized reactions when the oil undergoing treatment is maintained in the liquid phase. With these conditions as disclosed.in the application being maintained in the Stafford patent, it appears that there is necessarily polymerization in the heating step."

Appellant evidently construes the last sentence above quoted as being a holding. by the board that polymerization is inherent in the heating coils of the Stafford device, and the holding so construed is assigned as error, with much argument thereon in appellant's brief.

The Solicitor for the Patent Office construes it differently. In his brief it is said:

"The second decision of the Board of Appeals * * * pointed out that in the petition for reconsideration appellant had argued there was 'no suggestion in the patent disclosure which would teach one skilled in the art that partial polymerization should be carried out in heating coil 1, nor that such partial polymerization is inherently present in the Stafford process.' Even then, the Board of Appeals did not say that polymerization was inherently present in the Stafford process. What the Board of Appeals did say * * *, after discussing the patent was as follows:

"With these conditions as disclosed in the application being maintained in the Stafford patent, it appears that there is necessarily polymerization in the heating step.

"The foregoing observation of the Board of Appeals is clearly sound logic since it must be obvious that if the same conditions which the application discloses are maintained in the apparatus in the Stafford patent the same results must follow, regardless of whether the patentee stated those results or not.

"The Board of Appeals, however, was not strictly concerned whether Stafford maintained the conditions disclosed in appellant's application but so far as the appealed claims were concerned, the question was merely whether the Stafford patent disclosed the conditions or steps specified in the appealed claims.

"It is fundamental that if appellant is entitled to a patent at all it must be based upon the steps enumerated and cannot be predicated upon the result attributed in the claims to flow from those steps."

In view of our conclusion in the case it is unnecessary for us to attempt an interpretation of the board's expression.

We have considered quite carefully appellant's arguments directed to the effort to establish that Stafford's disclosure is not of a two-stage process embracing in substance the two steps above defined, but we are not convinced that the holdings below upon this point were erroneous. It seems clear to us that the steps of first heating to a described temperature and then passing the so heated product through the earth towers shown by Stafford must of necessity be separate steps and that they must take place in the process carried out by the Stafford device in the order stated.

It may be conceded that Stafford does not say that he heats oil in his coil for the purpose of polymerization, while appellant in his specification does state such to be his purpose, but this does not affect the validity or force of the patent as a reference so long as it discloses the step of subjecting the oil to the temperature and pressure. In re Adams, 88 F.2d 495, 24 C.C.P.A., Patents, 1043.

Another allegation of counsel for appellant is that the board misinterpreted the Stafford reference. The brief goes so far as to say that the board "attributes to this reference a character which is utterly false."

The argument respecting this quite vigorous assertion is not directed to the two steps of the claims, above set forth, but to a step defined, for example, in the last clause of claim 1 reading, "returning a portion at least of said polymers of the process for admixture with incoming charging oils to be treated for use as a polymerization promoting catalyst therein." This particular limitation appears only in claims 1, 8, and 13.

The insistence of appellant's counsel is that Stafford does not suggest the step of returning the polymers or a portion thereof to any part of his treating system but on the contrary suggests that the mixture of oil and polymers be subjected to cracking treatment externally of the system.

We do not understand the board to have held that Stafford teaches the return of the polymers in the manner taught by appellant. What the board actually said in its first decision is stated in the last paragraph quoted above from that decision. The statement is merely to the effect that there is in the Stafford patent a

teaching that the solvent oil, etc., may be used as the liquid solvent in the treating process in Stafford's heating coil 1. In its brief discussion of this point in its second decision the board went no further, as we interpret its language, than it did in the first decision. As we understand the board's decision, particularly when taken in connection with that of the examiner which it affirmed, other references, referred to by counsel as secondary references, were held to show the step of returning or recycling the material to the heating coil. The teaching of the patent to Gray was specifically referred to by the board in this connection.

Counsel for appellant urge that the "secondary references do not bridge the gap between the primary references and appellant's invention" and in support of this contention analyze certain features of such references. With respect to the Gray patent showing relative to the matter of "recycling" it is conceded that it shows a return of the polymer liquid to the base of the fractionating tower, but the purpose of returning it, counsel say, in effect, differs from the purpose taught by appellant, appellant's purpose being to use it "as a polymerization promoting catalyst" when admixed with incoming charging oils.

It seems to us that the return, not the purpose of the return, is the matter here of importance from the patentable standpoint. Gray shows the return.

In the oral argument before us counsel for appellant emphasized the limitation appearing in counts 12 and 13 with respect to the retention of the mixture of low boiling oils and previously formed hydrocarbon polymers in the heating zone through which it passes "for a sufficient period of time to polymerize at least in part the objectionable gum-forming compounds present in said oils."

This specific limitation does not seem to have been independently discussed by the examiner in his statement, but it received the attention of the board in both of its decisions from which quotations have been already made. Attention is directed to the second paragraph quoted from the second decision wherein the board pointed out that the insistence was made that a longer period of time is required to effect polymerization in the first stage (by which we understand is meant in the heating zone) than in the second stage. The board then said, in effect, that the difference in time does not appear to have been incorporated in the claims and added, "In any event, it is believed such limitations would not render these claims patentable over the Stafford patent." In view of the disclosures of the Stafford patent, as quoted, supra, from the board's first decision, we are not convinced that the holding as to this limitation was erroneous. In other words, the conditions disclosed by Stafford as being maintained in his patent would seem necessarily to embrace, as held by the board, some "polymerization in the heating step." No period of time for retaining the mixture in the heating zone is specified by appellant as being critical, the expression being simply "for a sufficient period * * *."

With respect to claim 15 there was a special reason of appeal assigned in the appeal to us to the effect that the board erred in failing specifically to pass upon its merits. The claim apparently was added at some time after the final action on the other claims by the examiner and before the examiner's statement following the appeal to the board. It is stated that it was added for the purpose of appeal. The board did not specifically discuss it in its original opinion and it was not embraced in the group of claims specially mentioned in appellant's request to the board for reconsideration. It was quite fully discussed in the examiner's statement as follows:

"Claim 15 is modeled after allowed claim 3, but is broader in not numerically specifying the pressure used. This claim is more limited than the other claims involved in this appeal in stating 'consists' (rather than 'comprises'), and is also apparently more limited than allowed claim 3 in stating that the hydrocarbon polymers are 'unmodified'. Claim 15 is substantially met by Stafford in view of Stevens et al. Recycling of polymers is disclosed by Stevens et al. and to add this feature to Stafford is not seen to require invention. Stafford having liquid phase and temperatures of 500°F. or higher; note Stafford's suggestion of increasing temperature on page 1, lines 87-96. Claim 15 is also considered substantially met by Cross in view of either Osterstrom et al. the Gurwitch article, or Stevens et al; in taking this view the examiner is at this point relying especially on the discussion of the prior art on page 1, lines 63-67 of Osterstrom et al."

In the absence of any showing to the contrary it must be assumed that the Board of Appeals performed its duty and considered claim 15 upon its merits. The fact that it expressed no opinion specific to it in its decision may be regrettable in view of the circumstances of the case but that fact does not constitute reversible error.

In view of our conclusion upon the principal issue presented and with respect to the limitations so far discussed, a recital of our views upon other incidental questions discussed in the briefs and arguments before us could serve no good purpose.

We think there is no reversible error to be found in the decision of the Board of Appeals and the same is affirmed.

Affirmed.